United States District Court
Eastern District of Michigan
Southern Division

| | |
|---|---|
| United States of America, | Criminal No. 17-20184 |
| Plaintiff, | Honorable Judith E. Levy |
| v. | |
| D-5 Sontez Wells, | |
| Defendant. | |

**Government's Sentencing Memorandum**

## I.   Introduction

Defendant Sontez Wells pleaded guilty to RICO conspiracy because he is a long-time member of one of Detroit's most violent gangs—Young and Scandalous or YNS. YNS has terrorized the beleaguered Brightmoor neighborhood for years. The gang victimized the poor and vulnerable people of Brightmoor to extract money and status. Wells used social media to advance this violent criminal enterprise. He murdered a young 22-year-old man—by shooting him several times during a YNS armed robbery—and bragged about it on Facebook. Even though Wells himself sustained gunshot wounds during the murder, he kept on robbing. A few months later, he repeatedly punched a woman in the face and stole her purse. These acts were just a small part of his violent criminal history—he has the highest possible criminal history category (VI).

The Court should sentence Wells to reflect the loss of life at his hands, and the real damage he caused to YNS's victims, their families, and the community.

1

## II.  Facts

YNS dominated Brightmoor by purposefully developing a reputation for ruthless violence so they could sell drugs. The indictment sketches many of their violent acts, and Wells committed some of the most hardcore—including murder. He used also social media to promote YNS's crimes and the random ("vs whoeva") nature of the gang's violence.



Along with the gang, Wells promoted the reputation of YNS criminals and their violent crimes.

YNS used social media to glorify guns and murder by posting the photos of convicted YNS murderers and violent members. This collage features several.



YNS and Wells repeatedly posted intimidating photos of Wells and other gang members armed with guns.






4

These are real guns, loaded, and ready for action.



Wells did not make empty threats or bluffs. He proved he was willing to use a loaded gun.

### *Wells—robber and shooter*

Wells has held a position in YNS since 2010. (Rule 11, ¶ 1.C). Wells was a self-proclaimed "Soldier." He trumpeted his membership on social media with the name "YNS Skit." YNS members like Wells regularly committed robberies in order to obtain money and property. Gang members were usually armed, but sometimes they would simply beat their victims into submission.

One example is the summer of 2013, when Wells posted this photo of the three gang members—Wells, Kevin Pearson, and Andre Chattam. They all are throwing gang signs and Chattam is making a trigger finger.



Around the same time, on August 22, 2013, Wells, Pearson, and Chattam were driving a car through Brightmoor looking for a target. Wells and Pearson left the car and attempted to rob a man at a local gas station. (PSR ¶ 17). Wells shot several times and killed the man while Pearson was helping Wells to rob him. (*Id.*). During the robbery, the victim (a CPL holder) shot Wells. (*Id.*). After Wells and Pearson returned to the car, Chattam acted as the getaway driver. When they arrived a local hospital, Wells used the name of a deceased YNS gang member.

This murder and his own wounds did not deter Wells. The next day while in the hospital, he posted himself making a gang sign, and trumpeted "YNS da mob!!" and his status as a "Soldier."



Wells emphasized that this was not the first time had done something like this.

7

Wells repeatedly boasted about the shootout and that he had killed his robbery victim.




When he was out of the hospital, Wells posted a photo with Pearson. He is throwing gang signs, and exclaiming "Mobb life!!"

8

Within days, Wells was looking for another dangerous gun—an assault rifle—and posting a photo of his Luger handgun.





9

The August 22, 2013 murder was not his only robbery. On October 12, 2013—just weeks after getting out of the hospital—Wells repeatedly punched a 43-year-old woman in the face and stole her purse in the parking lot of a shoe store. Wells caused her serious physical and emotional damage, as shown in the PSR (¶¶ 20, 56) and police report. After Wells beat her, she just laid wounded in her car.



### *Wells and YNS sold drugs*

YNS existed for the purpose of enriching its members through unlawful means. (Rule 11, ¶ 1.C). Members of YNS engaged in drug trafficking and earned substantial revenues from drug sales. (*Id.*). YNS members sold drugs including marijuana, cocaine, cocaine base, heroin, and prescription pills. (*Id.*). The gang frequently used vacant houses as bases of operation for drug sales, referring to such locations as "trap houses" and stocking them with firearms, ammunition, YNS paraphernalia, and large quantities of drugs. (*Id.*). Wells admitted to selling drugs. (*Id.*).

### *Wells and YNS promoted their brand*

YNS used traditional gang promotion methods like tattoos (Wells has several) and tagging ("Y.N.S. the MOB" and "BMG").



11



Again, Wells and YNS used the internet and "numerous means to publicize the gang and their affiliation." (Rule 11, ¶ 1.C).



12

### III. Advisory Sentencing Guideline

The parties agreed in the Rule 11 that Wells's guideline range was 360 months to life in prison (total offense level 42, criminal history category III). (Rule 11, Guideline Worksheet D). The probation department found a total offense level of 40 and a criminal history category VI, resulting in the same guideline range. (PSR ¶ 90). The Rule 11 caps the sentence at 360 months (30 years). (Rule 11, ¶ 3A).

### IV. Sentencing Guideline and other 3553(a) factors

Congress has provided, through 18 U.S.C. § 3553(a), the relevant objectives and factors to be considered by sentencing courts in imposing a "sentence sufficient, but not greater than necessary." Those objectives are: (1) the nature and circumstances of the offense, and the history and characteristics of the defendant; (2) the need for a sentence to reflect the basic aims of sentencing (including retribution, deterrence, incapacitation, and rehabilitation); (3) the kinds of sentences legally available; (4) the Sentencing Guidelines; (5) Sentencing Commission policy statements; (6) the need to avoid unwarranted sentencing disparities among defendants with similar records who have been found guilty of similar conduct; and (7) the need for restitution. The most relevant factors are evaluated below.

### A. The advisory guideline range

The advisory Guidelines remain an important factor in sentencing. "[I]t is fair to assume that the Guidelines . . . reflect a rough approximation of sentences that might achieve section 3553(a)'s objectives." *United States v. Rita*, 551 U.S. 338, 345 (2007). A

13

district court should begin sentencing proceedings by correctly calculating the guidelines. *United States v. Gall*, 128 S. Ct. 586, 596 (2007).

## B. Nature and circumstances of the offense, and the history and characteristics of the offender, 18 U.S.C. § 3553(a)(1)

### 1. Nature of the offense

YNS is a violent street gang that "promote[d] its violent reputation through social media posts[.]" (Rule 11, ¶ 1.C). Wells is a longtime member. With his help, YNS purposefully developed its ruthless by committing violent acts. YNS's domination of the neighborhood caused Brightmoor residents to live in fear of shootings, robberies, beatings, and arson. YNS forced the community to endure violence, and the regular use of neighborhood businesses and residences as drug markets, because the gang will not tolerate interference with its members' revenues or threats to its dominance.

Like all YNS members, Wells is responsible for the foreseeable acts committed by the other members to advance the conspiracy. *United States v. Nicholson*, 716 F. App'x 400, 409 (6th Cir. 2017), c*ert. denied*, 138 S. Ct. 1337 (2018) (applying *Pinkerton v. United States*, 328 U.S. 640, 646-48, (1946) to RICO coconspirators). *See also United States v. Corrado*, 286 F.3d 934, 937 (6th Cir. 2002) (in a "RICO enterprise . . . 'the supporters are as guilty as the perpetrators . . . so long as they share a common purpose, conspirators are liable for the acts of their co-conspirators.'") (quoting *Salinas v. United States*, 522 U.S. 52, 63-64 (1997)). This includes countless acts of violence and drug dealing.

Just two of Wells's violent episodes—his murder and strong-armed robbery months later— illustrate YNS's impact. He killed one young man at a gas station and brutally assaulted a women coming from a shoe store. Both his victims were random.

These are exactly the harms that "contribut[e] to the economic and social decline of [gang-dominated] neighborhoods" and "caus[e] fear and lifestyle changes among law-abiding residents." *City of Chicago v. Morales*, 527 U.S. 41, 98-99 (1999) (Thomas, J. dissenting) (quoting U.S. Dept. of Justice, Office of Justice Programs, Bureau of Justice Assistance, Monograph: Urban Street Gang Enforcement 3 (1997)). "Gangs fill the daily lives of many of our poorest and most vulnerable citizens with a terror . . . often relegating them to the status of prisoners in their own homes." *Id.* (citing U.S. Dept. of Justice, Attorney General's Report to the President, Coordinated Approach to the Challenge of Gang Violence: A Progress Report 1 (Apr.1996)) ("[For] the families who are hostages within their homes, living in neighborhoods ruled by predatory drug trafficking gangs, the harmful impact of gang violence . . . is both physically and psychologically debilitating"). As the PSR noted, "YNS terrorized and violated the Brightmoor neighborhood for years. In addition, narcotics trafficking destroys neighborhoods and communities with the violence and addictions it brings." PSR ¶ 108.

The residents of Brightmoor were the primary victims of YNS's violent dominion throughout the decade-long racketeering conspiracy. This a vulnerable neighborhood that has suffered tremendous population loss and is one of the poorest neighborhoods in Detroit.[1] One 2016 article noted the contrast between the developing areas of Detroit and Brightmoor and found that "[e]ven with a depleted population, crime is still a big

---

[1] *See* Data Driven Detroit, *Brightmoor Neighborhood Profile* (April 2012). https://ssw.umich.edu/sites/default/files/documents/research/projects/good-neighborhoods/brightmoor-profile-2013-081913.pdf

15

issue in this neighborhood[.]"[2] Wells's conduct, and of the gang members under his leadership, contributed directly to Brightmoor's high crime rate and its status as "one of the most blighted areas in Detroit."[3] Brightmoor residents have reason to worry that they "could become a throwaway community."[4]

### 2. History and characteristics

At the age of 25, Wells has already compiled the highest possible criminal history category (VI). (PSR ¶ 60). Here, he pleaded guilty to a RICO conspiracy centered on violence and drug distribution. YNS has committed a host of violent crimes, including murder, robbery, and arson. (R. 169: Third Superseding Indictment). Wells pleaded guilty based on strong-arm robbery and murder in the course of an armed robbery. These are not his only crimes and convictions.

In 2009, he committed assault and battery with another YNS member. (PSR ¶ 52). Wells and the other gang member started to yell obscenities at the victim, confronted him, and both punched him in the head and fled the area. (*Id.*). The victim called 911 and followed them in his vehicle. (*Id.*). Wells and the other gang member started hitting

---

[2] *See* "*Detroit's most dangerous neighborhoods still struggling during city's comeback*" (February 17, 2016).
https://www.mlive.com/news/index.ssf/2016/02/detroits_most_dangerous_neighb.html

[3] *See* "*Detroit area's battle with blight may be key to survival*" (July 25, 2013).
https://www.reuters.com/article/us-usa-detroit-blight/detroit-areas-battle-with-blight-may-be-key-to-survival-idUSBRE96O02T20130725

[4] *See id.*

16

the victim's windows with their fists. (*Id.*). A police officer responded and found Wells, who resisted arrest and failed to respond to the officer's orders. (*Id.*). The officers had to leg sweep Wells to get him to the ground. (*Id.*).

In 2010, Wells committed armed robbery and felonious assault. (*Id.* ¶ 53). Wells stole items at the Marathon Gas Station in Detroit, while armed with a gun. (*Id.*). During this larceny, Wells fired the gun. (*Id.*). He also maliciously destroyed part of the gas station along with the victim's vehicle. (*Id.*).

In 2012, Wells was with other YNS members in a car and convicted of drug possession. (*Id.* ¶ 54). In 2014, Wells was convicted for obstruction of justice for his use of an alias during the investigation of the August 22, 2013 murder. (*Id.* ¶ 57). In addition to those crimes, police arrested Wells several other times, including another robbery in 2007. (*Id.*, ¶¶ 63-65).

## C. Seriousness of the offense, promoting respect for law, and providing just punishment, 18 USC § 3553(a)(2)(A)

The advisory guidelines create a range so the courts can sentence similar defendants appropriately based upon the severity of their conduct. Wells is a self-proclaimed member of one of Detroit's most violent street gangs. He murdered a random person during a YNS armed robbery. This is the most serious crime, but not his only violent crime. He attacked and robbed a random woman and several others.

## D. Adequate deterrence and protecting the public from further crimes of the defendant, §3553(a)(2)(B) and (C)

Deterrence is especially important in this case. In the past, courts gave Wells breaks and he has served little time considering his criminal history. He responded by

17

committing new crimes while Brightmoor suffered. The most troubling example is the sequence of events following his 2013 murder. Within months, he had boasted about it, attempted to get an assault rifle, robbed another random victim, and obstructed justice. The court should impose a sentence that protects the public generally—and the people of Brightmoor specifically. The court must deter Wells from guns, violent robberies, shootings, and his role in the decade-long YNS criminal enterprise.

## V.  Conclusion

The government recommends that the Court impose a sentence to reflect the loss of life at his hands, and the real damage he caused to YNS's victims, their families, and the community.

Matthew Schneider
United States Attorney

*s/Jerome F. Gorgon Jr.*
JEROME F. GORGON JR.
Assistant United States Attorney
211 West Fort Street, Suite 2001
Detroit, Michigan 48226-3211
(313) 226-9676
jerome.gorgon@usdoj.gov

Dated: November 7, 2019

## **Certificate of Service**

I hereby certify that on November 7, 2019, I electronically filed the foregoing document under seal with the Clerk of the Court and will provide a copy of such filing to the attorneys of record, Harold Gurewitz and Michael Sheehan.

*/s Jerome F. Gorgon Jr.*
JEROME F. GORGON JR.
Assistant United States Attorney
211 West Fort Street, Suite 2001
Detroit, Michigan 48226
(313) 226-9676
jerome.gorgon@usdoj.gov